## Welch's Petition

SCHNADER, Attorney General, and ARNOLD, Deputy Attorney General, September 12, 1932.—Ben T. Welch has filed with the attorney general a petition asking that the Commonwealth institute a quo warranto proceeding against Keystone Pipe Line Company to oust the company of certain corporate rights and privileges which the company claims to exercise under its charter and the laws of the Commonwealth. For the sake of brevity, the respondent company will hereafter be referred to as the company.

The company filed an answer and testimony was taken.

24

The petitioner alleged and proved that he is owner of a tract of land in Philadelphia County across which the company has constructed a pipe line, for the purpose of transporting gasoline, and which is now being used for that purpose. · He alleged that the pipe line was located on his premises as the result of an exercise of eminent domain by the company, and the issue is whether the company may exercise the power of eminent domain for such a purpose.

The company, in addition to asserting its legal right to exercise the power of eminent domain under these circumstances, also contended that there was no exercise of such power in respect to the land of the petitioner.

The specific objections raised by the petitioner are, in substance, (1) that the company's charter and the acts of assembly under which the charter was granted did not confer the right of eminent domain for the purpose of transporting gasoline, and, (2) that in operating the pipe line in question the company is not a public service corporation or a common carrier, and, therefore, even if the acts of assembly and the charter purport to confer the power of eminent domain, they are unconstitutional.

The company is a Pennsylvania corporation incorporated on May 19, 1931, under the Act of April 29, 1874, P. L. 73, "and the several supplements thereto."

The charter states the purpose of the corporation to be "the transporting, storing, insuring and shipping petroleum and refined petroleum products, and to construct, maintain and operate such pipe lines, tanks and facilities as are necessary and proper for the conduct of certain business, said pipe line or pipe lines to run within the Commonwealth of Pennsylvania, including a pipe line or pipe lines beginning at or near the vicinity of Point Breeze, Philadelphia," and extending through certain counties and to certain points therein named.

Prior to the issuance of the charter, the Public Service Commission of the Commonwealth had issued a certificate of public convenience, approving the incorporation of the company, as required by law.

The company seems to rely for the basis of its charter on the Act of June 2, 1883, P. L. 61 (which was a supplement and amendment to the General Corporation Act of 1874), as amended by the Act of April 30, 1929, P. L. 896. This Act of 1883 provided for the incorporation of companies with power to transport, store, insure and ship petroleum. The second section of the act refers to companies incorporated for the transportation and storage of oil. The Act of 1929 amended the second section but did not alter the use of the words "petroleum" or "oil."

If these supplements to the General Corporation Act of 1874 were the only ones upon which this charter could be based there might arise a question as to the right of the company to transport gasoline at all. However, the supplementary Act of May 11, 1909, P. L. 515, which authorized the formation of corporations "for any lawful purpose not specifically designated by law," is full warrant for the present charter. The petitioner, recognizing the scope of the Act of 1909, does not contend that this company may not in any event transport gasoline. Eminent domain is the sole issue.

The company's first contention is that it has not exercised eminent domain as to this petitioner.

It is to be noted in passing that Mr. R. C. Tuttle, the respondent's vice president and general manager, testified that in the construction of its pipe lines the company had dealt with approximately six hundred tracts of land, and that in about one hundred thirty-five cases condemnation bonds were filed in court, and in two cases, in addition to the present one, other litigation was instituted. Thus it is apparent that the company has purported to exercise the power of eminent domain in the construction of its lines. However, it will not be necessary for us

to consider whether that admission would be sufficient grounds on which to base a proceeding in quo warranto in the absence of the exercise of eminent domain as to the particular petitioner.

The circumstances concerning the construction of the line across this petitioner's premises were developed at length in the testimony. Briefly they were these.

Some time in July, 1931, the company's right of way agent interviewed the petitioner with the object of purchasing a right of way for the pipe line across petitioner's land.

A number of conferences took place, and the company made certain offers, all of which Welch rejected. No agreement was ever reached. About July 31; 1931, the company's agent tendered to the petitioner the following letter:

"July 31st, 1931.
"Mr. Ben T. Welch,                                                    "EO-KPL-P.
    "Penfield Building, Philadelphia, Pa.
    "Dear Sir: Referring to your conference with Mr. C. Edwin Hunter, please be advised that this Company hereby undertakes to pay you such an amount of damages as you shall be entitled to receive after the same has been agreed upon or assessed in the manner prescribed by law by reason of this Company's entry upon your lands located at or near 70th Street and the Chester Branch of the Philadelphia and Reading Railroad Company, Philadelphia, as shown on the survey attached hereto and made a part hereof, to the extent of a right of way easement for the purpose of locating and maintaining an eight inch pipe line thereon.

"This Company further undertakes, if you so desire, to deliver to you at any time upon request its bond with the Independence Indemnity Company as surety for such damages as mentioned in the first paragraph of this letter.
                                "Very Truly Yours,
                                    "KEYSTONE PIPE LINE COMPANY,
                                        "By (Signed) R. C. TUTTLE,
"OHP:G                                                        "Vice President.
"The above is hereby agreed to."

Welch never signed the agreement which was prepared at the end of the letter.

Thereafter there was an offer by the company to give a bond. The petitioner inquired whose bond it would be, and when given the name of the surety company which the respondent proposed to offer the petitioner said that it would not be satisfactory. The company's agent then suggested the National Surety Company, and the testimony is that Welch did not object to it. An open-end bond was prepared and was handed to him. He received it and has retained it. This was done some time in the first week of August.

The petitioner testified that he never consented to the entry of the company on his land, and that in the course of his conversation with the agent he was told that if they could not agree on a price, the company would take the right of way by eminent domain. He said that the company had already entered his land on August 4th. The bond given to him by the company bears that date.

In view of these facts, we are not impressed by the company's argument that its entry on the petitioner's land was the result of a voluntary grant of a right of way. Nothing in the record even tends to sustain that argument except the fact that Welch received and did not affirmatively reject the bond that was given to him. But the bond itself was conditioned for the payment to the petitioner of such damages as he "shall be entitled to receive after the same have been agreed upon or assessed in the manner prescribed by law in such case made and pro-

vided, by reason of the entry upon, use, occupation and appropriation by the Keystone Pipe Line Company of the said land to the extent of a right of way easement for the purpose of locating and maintaining a pipe line . . . under or across said land." The letter which we have quoted used similar phraseology.

The form of the bond is clearly that of a condemnation bond. The conversations that passed between the petitioner and the agent of the company all clearly indicate the intention of the company to enter upon the land and lay its pipe irrespective of whether the owner should consent thereto or not. The fact that the company had already entered upon the land on the date of the execution of the bond confirms this conclusion. Moreover, the tender of the bond was in exact conformity with the procedure prescribed by section three of the Act of June 2, 1883, P. L. 61, for cases in which pipe line corporations are unable to agree with the owner or owners of lands which they propose to occupy.

Therefore, we conclude that the petitioner has established, prima facie at least, that the company has appropriated his land without his consent.

It is further argued by the company that this proceeding must fall because the petitioner would have an adequate remedy under the Act of June 19, 1871, P. L. 1360. That act gives to individuals the right to test by bill in equity the exercise of corporate powers in certain cases.

In view of the construction placed on this act by the Supreme Court in Gring v. Sinking Spring Water Co., 270 Pa. 232 (1921), and Croyle v. Johnstown Water Co., 259 Pa. 484 (1918), it is extremely doubtful whether this petitioner could raise the present questions under the Act of 1871.

In Heller v. Susquehanna Pipe Line Company, in the Court of Common Pleas of Lancaster County, Equity Docket No. 8, page 96 (1930), the complainant attempted to raise by bill in equity under the Act of 1871 the same questions that are raised in the present proceeding. Except for the fact that that case was instituted before the defendant company had laid its pipe lines, the situation was the same as involved here. The court ruled that the bill could not be maintained under the Act of 1871, saying that only the Commonwealth could raise such questions. For its decision, the court relied on Gring v. Sinking Springs Water Co., supra; Blauch v. Johnstown Water Co., 247 Pa. 71 (1915) ; Mountz v. Pittsburgh, Bessemer and Lake Erie R. R. Co., 265 Pa. 67 (1919).

Irrespective of what might be the petitioner's rights under the Act of 1871, nothing in that act limits the right of the Commonwealth to question corporate activities which it may consider to be in violation of charter or constitutional limitations. The present proceeding is a petition calling upon the Commonwealth to exercise those powers, and if a proper case for such exercise is shown, the fact that the petitioner might have a private remedy is not a bar to action by the Commonwealth.

The petitioner's first contention is that the acts of assembly under which the company is chartered did not grant to it a power of eminent domain for the transportation of gasoline.

It is first said by the petitioner that the company has no power of eminent domain whatsoever, because the Act of June 2, 1883, P. L. 61, which purports to confer the power, has been repealed by later legislation. From this premise he would conclude that the Act of April 30, 1929, P. L. 896, which purports to amend the Act of 1883, is a nullity.

It is argued that the Act of 1883 is no longer in force, because after 1883 certain further supplements and amendments to clause eighteen of section two of the General Corporation Act of 1874 were adopted, which omitted reference to the amendment contained in the Act of 1883. It is contended that since these later amendments, notably the Act of May 21, 1889, P. L. 259, purported to state

the clause in full, without reference to the amendment of 1883, that amendment must be regarded as having been repealed.

In our opinion, this argument cannot prevail. In Wasson v. Woods, 265 Pa. 442 (1919), and Mercersburg College v. Mercersburg Borough, 53 Pa. Superior Ct. 388 (1913), the Supreme and Superior Courts respectively considered acts of assembly that had been amended more than once, the later amendments not referring to the prior ones. In both of these cases the courts assumed that the intermediate amendment would stand as a valid part of the original act.

Moreover, in Lehigh Valley Coal Co. v. U. S. Pipe Line Co., 3 Dist. R. 70 (1893), Judge Woodward, of the Court of Common Pleas of Luzerne County, held that the Act of 1883 was not dependent for its validity on the reënactments and amendments of the portion of the General Corporation Act of 1874 to which it was a supplement. That case decided that the pipe line company there involved had the power of eminent domain under section two of the Act of 1883.·

Therefore, in our opinion, the Act of June 2, 1883, P. L. 61, and the amending Act of April 30, 1929, P. L. 896, must be treated as in force.

Thus we come to the question whether the grant of the power of eminent domain contained in the Act of June 2, 1883, P. L. 61, for the transportation of oil or petroleum is to be construed as authorizing the exercise of that power for the transportation of gasoline. In other words, can it now be said that when the legislature used the terms "oil" and "petroleum" in the Act of 1883, and when it again used the word "oil" in the amending Act of 1929, it included within those terms gasoline?

We have examined the host of definitions of gasoline and oil and the many opinions which have been cited on the question whether gasoline is oil. The question is one of considerable difficulty. If it were the function of the attorney general to make a judicial determination of it, we should feel obliged to analyze in detail these many conflicting definitions and opinions. However, it is not our duty to decide whether gasoline is oil within the meaning of the acts of assembly, but simply to determine whether there is a substantial question affecting the public interest, which would warrant submission of the issue to a court of proper jurisdiction.

Accordingly, we shall merely state briefly the general nature of the evidence presented to us.

At the hearing each side produced an expert whose testimony conformed to the contention of the party calling him. The petitioner's witness was Samuel S. Sadtler, an experienced consulting and analytical chemist. Mr. Sadtler expressed his professional opinion that gasoline was not included in the accepted meaning of the word oil.

The company called Thomas G. Delbridge, who described himself as a supervisor of research. He has been an employe of the Atlantic Refining Company for twenty-two years, four years as a chemist, five years as a plant superintendent, two or three years as chief chemist, and since 1923 he has been director of research for the company. He is Vice President of the Petroleum Committee of the American Society for Testing Materials.

Mr. Delbridge expressed the opinion that gasoline is oil and that the term "oil" includes gasoline.

Judicial definitions from other jurisdictions have been referred to copiously in the briefs. While they might be of some value in determining the ultimate question, those cases would all have to be considered on their own facts, and their applicability to the present case carefully analyzed. Many of them involved the construction of oil and gas leases, where it was necessary to classify casing-head gas (a natural product of certain wells which is practically gas-

oline) either as gas or oil. The leases in question provided for royalties on gas and oil obtained from the wells in question, but stipulated no price for possible casing-head gas. Therefore, in order to give the lessors any return from this valuable product, it was necessary to bring casing-head gas within one of those two terms. The value of such cases here is questionable.

Necessarily, none of these cases from foreign jurisdictions dealt with the intent of the Act of 1883, which, after all, is our real concern.

Both parties have referred us to the various legislative uses of the terms "oil," "petroleum," "petroleum products," and "gasoline" in our own state.

A number of our statutes obviously use the words "oil" and "petroleum" as practically synonymous.

The Act of August 10, 1864, P. L. (1865) 948, incorporated "Humboldt Petroleum Works," with power to market, transport, etc., "mineral oil and other similar products." The Act of September 8, 1868, P. L. (1869) 1393, incorporated "Atlantic Petroleum Storage Company," authorized to store "oil, petroleum, benzine, and articles of a like nature."

The Act of May 15, 1874, P. L. 189, was entitled "An act to provide for the better security of life and property from the dangers of coal and petroleum oils." Section one of the act imposed regulations upon the sale of "refined petroleum, kerosene, naptha, benzole, gasoline or any burning fluid, be they designated by whatsoever name."

That act would indicate an effort by the legislature to include gasoline within the general term "petroleum oils" used in the title. But any implication that could be derived from that fact would beg the present question, for if the contention of the plaintiff here is correct, that gasoline is not oil, then the title to the act of assembly would be open to the charge that it did not, in fact, include gasoline.

On the other hand, the Acts of June 15, 1923, P. L. 834, and June 29, 1923, P. L. 969, define liquid fuels as including "all distillates of, and condensates from, petroleum, natural gas, coal, coal tar, and vegetable ferments—said distillates and condensates being ordinarily designated as gasoline, naphtha, benzol, benzine, and alcohols so usable. . . ." Similar language was carried into later legislation. The Acts of May 21, 1931, P. L. 149, and June 1, 1931, P. L. 298, used slightly different definitions of liquid fuels from those previously used, but the changes were immaterial as far as our present question is concerned.

These acts and others referred to by the parties show no consistency in our legislation in the use of the terms oil, petroleum, gasoline, etc. It would appear that the words oil and petroleum are frequently used interchangeably. Whether they were meant to include gasoline might in each particular case be the subject of a controversy such as we have here. Some of the acts to which we have referred would point to such an inclusion. Others appear to distinguish between oil or petroleum and the refined products of petroleum, of which gasoline is one.

Reference is made in the briefs to financial journals which refer to all petroleum industries as oil industries and to other similar failures to make any distinction between petroleum and gasoline or other refined products. On the other hand, we doubt whether any motorist drawing up to a service station and asking for oil would expect to get gasoline. Certainly a great body of people without technical knowledge do not think of gasoline as an oil.

In addition to all this, it must be remembered that the Act of 1883, which gave rights of eminent domain to pipe line companies, was passed at a time when gasoline formed a comparatively small portion of the products of oil companies and that the authority given by the second section of that act was for the exercise of eminent domain for the carrying of *oil* "from any point or points in any

of the counties in which petroleum is produced to any railroad, canal, navigable river, port or city within this Commonwealth." From this it is apparent that when the Act of 1883 was passed, its object was to facilitate the movement of oil from the wells to railroads and cities, and, of course, to the refineries. It was not until the Act of April 30, 1929, P. L. 896, amended the Act of 1883 that the exercise of eminent domain was permitted for the carrying of oil in any direction other than that prescribed by the above-quoted passage. However, when the Act of 1929 was adopted, the legislature retained the use of the word "oil" alone as designating the product which might be transported in pipes laid under the power of eminent domain. If the legislature did not intend to include refined petroleum products when it used the term "oil" in 1883 (and of course that question is in issue here), can it be said that the amendment of the Act of 1883 in 1929 without change of phraseology in this respect evidences an intention of the legislature to enlarge the number of products that may be carried in such pipe lines? We think not.

And finally, it is not without some significance that this present respondent in applying for its charter sought power to transport not only oil or petroleum, but seemed to feel the necessity of adding to those words the phrase "and refined petroleum products." The use of this phrase does not conclude the matter, but it is an indication that the company, intending to carry gasoline, was not satisfied to rest its power to do so on a charter allowing transportation of oil or petroleum only.

Webster's New International Dictionary (1927) defines gasoline and petroleum as follows:

"Gasoline: A volatile inflammable liquid used as a solvent for oils, fats, etc., as a carburetant, and to produce heat and motive power."

"Petroleum: Rock oil, mineral oil, or natural oil, a dark brown or greenish inflammable liquid, which at certain points exists in the upper strata of the earth, whence it is pumped, or forced by pressure of the gas attending it. It is found in many localities, the most celebrated of which are Pennsylvania and Baku. Petroleum consists of a complex mixture of various hydrocarbons, and varies much in appearance, composition and properties. . . . Petroleum is refined by fractional distillation, yielding successively volatile products, kerosene, lubricating oils and paraffin. The table below gives a list of the best known volatile products from American petroleum, in order of volatility. Cymogene is gaseous except at low temperatures; the others are liquids. Since these products are mixtures there are no rigid boundaries between them; . . . According to some, petroleum ether includes both rhigolene and gasoline:—Product [s]: cymogene, rhigolene, petroleum ether, gasoline, naptha, ligroine, benzine."

These illustrations of judicial, technical and legislative uses of the terms oil and petroleum and the various refined petroleum products make it apparent that there is a very real question of construction present in this case. If the respondent company has the power of eminent domain for the transportation of oil but not for the transportation of gasoline, then the petitioner's contention would seem to be sound. The only way in which this may be decided is by a judicial construction of the acts of assembly under which the company claims its power.

The second principal contention of the petitioner likewise presents difficulties. It goes to the very constitutional foundation of the company's claim of a right to exercise eminent domain. Petitioner insists that the company is not a quasi-public corporation, at least as to the operation of the pipe line here in question, and that the guaranties of article one, section ten, of the Constitution prevent the exercise of eminent domain under the circumstances even if the legislature has purported to grant the right.

The pipe line of this company originates in the vicinity of Point Breeze, Philadelphia, Pa., and extends northwestward to Montello in Berks County, Pa., where it divides into two branches. One branch continues northward to Kingston, Luzerne County, Pa., and the other goes westward to Mechanicsburg, in Cumberland County, Pa. Delivery stations are located at various places along the routes of the lines.

At the Point Breeze terminal the company now has a connection with the pipes of the Atlantic Refining Company, from which company it receives all of the gasoline that is shipped through the pipes. No other commodity has been transported and no other customer has been served. Refineries of the Gulf Refining Company were stated to be within about a mile and a half of this terminal, of the Pure Oil Company about five miles distant, and of the Standard Oil Company of Pennsylvania about a half-mile away. In order to make it possible for the Keystone Pipe Line Company to serve any of these other companies it would be necessary to construct connecting pipe lines over those distances.

It was testified by the company's vice president that there had been some casual conversations between officers of the Keystone Company and representatives of one or two of these neighboring companies concerning the possibility of the Keystone Company accepting gasoline for transportation from those companies. However, these conversations were of a most indefinite character, and apparently they had not been pursued with any intention of effecting transportation contracts within the immediate future.

It was testified that the present capacity of the company's system is approximately 12,500 barrels of gasoline per day, and that the Atlantic Refining Company, at the time of the hearing, was shipping about 6000 barrels a day. It was also stated that by installation of additional pumps the pipes could carry about 30,000 barrels per day. The witnesses were unable to say what would be the capacity of the system for the transportation of heavier liquids, such as crude oils or lubricating oils. To date, only gasoline has been transported, and the tariff filed with the Public Service Commission provides only for the transportation of that commodity.

It was testified that it is possible for the system to transport different lots of gasoline for different shippers at reasonable intervals, the different lots being separated by what is called a water plug. However, it was admitted by Mr. Tuttle, the vice president, that it would be impossible for the company to serve from day to day various customers, some of whom would furnish gasoline for shipment and others who would furnish heavy oils. That is an obvious conclusion, because pipes that have conveyed heavy oil would necessarily contain a residue which would be picked up by gasoline following it; this would contaminate the gasoline.

The testimony shows, as we have above stated, that at present the Atlantic Refining Company is the sole customer of the Keystone Pipe Line Company. Moreover, practically all of the stock of the Keystone Pipe Line Company is owned or controlled by the Atlantic Refining Company, and there are no officers of the Keystone Company who are not also employes of the Atlantic Refining Company. The capital provided for the incorporation of the Keystone Pipe Line Company was furnished by the Atlantic Refining Company by means of the purchase of stock.

The charter of the company in no way states directly that the purpose of the corporation is to serve the public, but the testimony of the officers of the company was, without exception, that such was the purpose of the corporation. In line with this stated intention, it was shown that the company has obtained a

certificate of public convenience from the Public Service Commission and has filed tariffs with the commission for the transportation of gasoline.

Do these facts disclose that the company is rendering such public service as would warrant the taking of private property by eminent domain to conduct its operations?

Article I, Sec. 10, of the Constitution forbids the taking of private property except for public use. Neither the Commonwealth nor any corporation acting under authority of an act of assembly may take private property against the will of the owner for the purpose of devoting it to such a use as the courts consider of a private nature: Penna. Mutual Life Ins. Co. v. Philadelphia, 242 Pa. 47 (1913).

The authorities which discuss the public or quasi-public nature of certain corporations fall into two groups. One group considers the liability of the corporations to public regulation of one kind or another. The other group deals with the privilege of the corporations to be exempted from certain taxation and their qualifications for the exercise of eminent domain. Both classes discuss the elements of public service; both use similar terms and phrases. But the standards are not the same. To decide that a corporation is engaged in a business of such a quasi-public nature that it is subject to public regulation (e. g., Munn v. Illinois, 94 U. S. 113 (1877) ), does not determine that the activities of the corporation involve such a public necessity for the acquisition of private property that the company may be granted the privilege of taking it by eminent domain.

Therefore, these two types of cases must be distinguished: This case is of the latter type, involving the claim of the corporation to the right of eminent domain.

No complete definition of what constitutes a public use warranting the exercise of eminent domain has been formulated. A thorough discussion of the question is to be found in the opinion of the Supreme Court in Penna. Mutual Life Ins. Co. v. Philadelphia, 242 Pa. 47 (1913). In the course of that opinion, at page 54, appears the following:

". . . Mr. Justice Pearce, delivering the opinion in Arnsperger v. Crawford, 101 Md. 247, 253, says: 'There will be found two different views of the meaning of these words which have been taken by the courts; one, that there must be a use, or right of use, by the public, or some limited portion of the public; the other, that they are equivalent to public utility or advantage. If the former is the correct view, the legislature and the courts have a definite, fixed guide for their action; if the latter is to prevail, the enactment of laws upon this subject will reflect the passing popular feeling, and their construction will reflect the various temperaments of the judges, who are thus left free to indulge their own views of public utility or advantage. We cannot hesitate to range this court with those which hold the former to be the true view.'

"We think this interpretation of the words 'public use' is in accord with their plain and natural signification and with the weight of the best considered authorities. It furnishes a certain guide to the legislature as well as to the courts in appropriating private property for public use. It enables the state and the owner to determine directly their respective rights in the latter's property. If, however, public benefit, utility or advantage is to be the test of a public use then, as suggested by the authorities, the right to condemn the property will not depend on a fixed standard by which the legislative and judicial departments of the government are to be guided, but upon the views of those who at the time are to determine the question. There will be no limit to the power of either the legislature or the courts to appropriate private property to public use except their individual opinions as to what is and what is not for the public advantage

and utility. If such considerations are to prevail, the constitutional guarantees as to private property will be of small moment."

The most recent expression on this subject by our Supreme Court is found in Philadelphia Rural Transit Company v. Philadelphia et al., 309 Pa. 84. That case did not involve a decision of the question of the exercise of the right of eminent domain, but the right of a particular company to exemption from local taxation on the alleged ground that it was such a public service company as is entitled to exemption. The opinion of the court, by Mr. Justice Maxey, discusses public service, exemption from taxation and exercise of eminent domain at length. Among other things, the opinion says (page 93):

". . . If every corporation that must perform public service as it is set forth in the Public Service Law of 1913 is to be classed as quasi public and therefore entitled to exercise the power of eminent domain and to be exempt from local taxation on its essential property, the result would be so obviously opposed to public interest as to forbid judicial acceptance of that formula. The implications of this doctrine are that all public service companies as defined by the Public Service Law are quasi public corporations. This doctrine becomes further patently unacceptable when it is realized that under the Public Service Law not only corporations engaged respectively in twenty-six different kinds of businesses but also *persons* engaged for profit in the same kinds of business are expressly included in the term 'public service company.' All these varieties of corporations and also all persons engaged in the same kinds of business are equally subject to the duties and liabilities of public service companies as set forth in article II, section 1, of the Public Service Company Law. . . .

"The possession of a certificate of public convenience does not, as contended, make a corporation quasi public, for this certificate merely evidences the Public Service Commission's approval of the organization of a public service company and of this company's beginning the exercise of any right, power, franchise or privilege under any ordinance, municipal contract or otherwise. The issuance of this certificate is in the nature of a license to organize and do business rather than, like the conferring of the right of eminent domain, official recognition by the Commonwealth that the corporation is performing service of such vital importance to the public that it is virtually engaged in the administration of a public trust.

"The argument that an omnibus company is entitled to the same tax exempting privileges on its essential property as a railroad company because like a railroad company it is engaged as a common carrier in the transportation of passengers and property, is plausible only when superficially considered. Railroads render a service that is both important and publicly indispensable. . . . Public use does not mean merely general convenience or advantage. Cooley on Constitutional Limitations, 8th Edition, Volume 2, page 1124, says: 'The right of eminent domain does not imply a right in the sovereign power to take the property of one citizen and transfer it to another, even for a full compensation, where the public interest will be in no way promoted by such transfer [citing, inter alia, Mayor et al. v. Scott, 1 Pa. 309]. . . . Nor could it be of importance that the public would receive incidental benefits, such as usually spring from the improvement of lands or the establishment of prosperous private enterprises; the public use implies a possession, occupation, and enjoyment of the land by the public at large, or by public agencies. . . . The reason of the case and the settled practice of free governments must be our guides in determining what is or is not to be regarded a public use; and that only can be considered such where the government is supplying its own needs, or is furnishing facilities for its citizens in regard to those matters of public necessity, convenience or welfare,

which, on account of their peculiar character, and the difficulty—perhaps impossibility—of making provision for them otherwise, it is alike proper, useful and needful for the government to provide.' . . .

"In Jacobs *v.* Water Supply Co., 220 Pa. 388, this court held that the power to take private property for public use can be invoked only when public exigency or necessity requires the exercise of this sovereign right, and that the use of the property taken must be a public one, and that 'the legislative determination of what constitutes a public use presumptively makes the purpose so declared a public use. This is only a presumption, however, and does not conclude parties from raising the question before the courts for judicial determination.'

"The question whether or not a corporation is quasi public is for the courts to determine on the facts of each case. A corporation cannot obtain judicial recognition as quasi public unless the service it renders to the public or a large part of it are so essential to public well being that any interference with its functions by local administrative agencies would be insufferable to the sovereign Commonwealth. . . ."

The Philadelphia Rural Transit Company case is pertinent because the issue there, as here, was as to the right of the corporation to a privilege of a special nature. Of course, in that case there was no express grant by the legislature of the privilege sought. In the present case there is the grant of the power of eminent domain to carriers of oil by pipe lines. Nevertheless, the general standards to be applied in both cases are the same.

Our problem is whether the facts of the present record so clearly disclose a case of a corporation whose activities meet the standards thus laid down by the courts that we would be warranted in refusing to permit the case to be made the subject of judicial determination.

For forty-five years oil pipe line companies have exercised the power of eminent domain under the Act of 1883. Courts recognized the right, and it was scarcely questioned that these companies were common carriers and that the condemnation of land by them was for a public use.

Is there any element which would lead to a different view of the matter now?

As we have noted, the Act of 1883 limited the exercise of eminent domain to the purpose of conveying oil *from* the oil-producing counties towards the refineries. The Keystone Pipe Line Company, acting under the amendment of 1929, carries gasoline from the refinery to the vicinity of retail distribution. It seems to us that the only difference that the change of direction could make in respect to the right of eminent domain, from a constitutional standpoint, would depend on the number of the public that it was possible to serve. In carrying from the oil fields, every owner of a well within a reasonable distance of the line was a potential customer. In the present case there are not over half a dozen potential customers, some of whom already use other pipe line facilities. The nature of the business, carrying refined products, necessarily limits the company's customers to oil refining companies. By reason of the huge investment necessary for such a refinery the number of such customers is very narrowly limited.

Therefore, the operation of the present company's line must be considered in the light of these facts: Its customers are necessarily limited to the large refiners or shippers of oil and oil products. Of necessity, these customers are few. The line itself can from day to day carry but a single oil product, and to change to some other commodity would require cleaning of pipes and other operating changes.

The company would seem to be a common carrier. Its profession of readiness to carry for the public is clear. But the Philadelphia Rural Transit Company case says that the fact that a corporation is a common carrier does not of itself

determine its status as a quasi-public corporation entitled to public privileges.

The question, then, becomes whether a common carrier, operating under the conditions disclosed by this record, is performing functions of such public necessity as to constitute the use of private lands by it a public use.

In Penna. Mutual Life Ins. Co. v. Philadelphia, 242 Pa. 47 (1913), supra, the Supreme Court has said that the purposes for which land may be taken by eminent domain must be uses by the public or some limited portion of the public. In the Philadelphia Rural Transit Company case the court stressed the additional requirement of public necessity for the use.

In Jacobs v. Clearview Water Supply Co., 220 Pa. 388, 393 (1908), it was held that the fact that a water company had but one customer at the time of the litigation would not be sufficient to deprive it of the right of eminent domain. Whether or not it is of particular significance here, it should be noted that the defendant in that case was organized to supply water and not simply to transport it. The number of potential customers of a water supply company is obviously large, and the opportunity to serve the public is correspondingly extensive.

In C. O. Struse & Sons Co. v. Reading Co., 302 Pa. 211 (1931), the Supreme Court sustained an exercise of eminent domain by a railroad company for the purpose of constructing a spur track to reach the plant of a single customer, Sears, Roebuck & Co. Other cases allowing similar extensions were cited. It is to observed, however, that in sustaining the railroad's power in the Struse case, the court stressed the extent to which the public would in fact be served by the track in question. It pointed out that the terminus of the spur was an established railway mail terminal, in which seventy-five postal employes were employed; that in a year prior to the litigation, the Reading Company had carried approximately four million consignments of merchandise for Sears, Roebuck & Co. over an old spur, later destroyed, reaching the same point.

Therefore, the fact that there is but a single immediate customer does not prevent the exercise of eminent domain, provided that there is in reality substantial service to the public. If other customers appear, the carrier may be compelled to serve them.

However, whether or not there is actual service to a sufficient number of the public, and whether or not there is such public necessity for the service as to warrant the exercise of eminent domain, are questions that must depend on the facts of each case: Phila. Rural Transit Co. v. Philadelphia, supra. And the attorney general should not presume to determine such questions unless they are free from all doubt.

Here we have a company at present serving a single customer and whose potential customers are few; a carrier whose facilities permit transportation at restricted intervals of only a very limited list of commodities which may also be carried by established carriers. Certainly the case is not so clear that the attorney general should stand in the way of a proper judicial consideration of it.

It has been argued that the granting of the charter of the company and the issuing of a certificate of public convenience to it by the Public Service Commission, together with the fact that other pipe line companies have transported gasoline without interference on the part of the Commonwealth, would in some way work an estoppel which would prevent the institution of quo warranto proceedings in the present case.

We recognize the unfortunate situation in which the company must necessarily find itself if the courts should determine that the power of eminent domain claimed by it may not be exercised. The record shows that this company has invested approximately two million dollars in its pipe lines and equipment. However, we fail to see how the legal principles involved can be affected by that

situation, or that the Commonwealth has done anything which would bar its right to proceed by quo warranto to question the company's actions.

Certainly the grant of the charter to the company could have no such effect. If the issuance of a charter estops the Commonwealth from later questioning the activities of the corporation, quo warranto proceedings could never be brought against any corporation.

Nor does the fact that the Public Service Commission issued a certificate of public convenience bear on the subject. As was pointed out in the Philadelphia Rural Transit Company case, a company may be a common carrier and yet not be entitled to a grant of the power of eminent domain. The certificate of public convenience could not guarantee to the company the right of eminent domain. Both of our appellate courts have decided that even where certain public service companies have obtained express consent of the Public Service Commission to the exercise of eminent domain in particular cases, under the Act of May 21, 1921, P. L. 1057, the granting of the certificate by the commission "determines neither the validity nor the scope of subsequent proceedings by eminent domain; it evidences only the preliminary approval by the regulatory body to whom general regulation of the service of such companies was entrusted as specified in the statute:" Dickel v. Bucks-Falls Electric Co., 306 Pa. 504, 511 (1932).

We cannot escape the conclusion that the petition, answer and testimony produced before us disclose substantial questions as to the authority of the Keystone Pipe Line Company to exercise the power of eminent domain for the transportation of gasoline, and that determination of those questions is of importance not only to the petitioner but to the public at large.

Therefore, it is our opinion that the case is a proper one for the institution of quo warranto proceedings.

Counsel for the petitioner may prepare and submit a form of suggestion for a writ of quo warranto.

From C. P. Addams, Harrisburg, Pa.